BARRY J. PORTMAN
Federal Public Defender
JOYCE LEAVITT
Assistant Federal Public Defender
1301 Clay Street, Room 200C
Oakland, CA 94612-5204
Telephone: (510) 637-3500

Counsel for Defendant MILLER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CR 07-00638 DLJ |
| Plaintiff, ) | |
| ) | DEFENDANT'S SENTENCING |
| v. ) | MEMORANDUM |
| ) | |
| JAY MILLER, ) | Date: March 7, 2008 |
| ) | Time: 10:00 a.m. |
| Defendant. ) | |
| ) | |

**INTRODUCTION**

On November 16, 2007, defendant Jay Miller pled guilty to a one count information charging him with a violation of 18 USC §2314 - interstate transportation of stolen goods. Mr. Miller will be sentenced by this Court on March 7, 2008. A presentence report ("PSR") was prepared by United States Probation Officer Charlie Mabie who miscalculates the advisory guideline range to be 24-30 months because he incorrectly attributes points for Mr. Miller being on probation at the time of the offense. PSR ¶¶49, 50, 72. Mr. Mabie recommends a sentence of 24 months in custody. PSR, Sentencing Recommendation. The government recommends that Mr. Miller serve 18 months in custody. *See* U.S. Sentencing Memorandum filed February 29, 2008. Mr. Miller asks the Court to sentence him to a split sentence of 8 months in custody and 2 months in home detention or half-way house. Such a sentence is "sufficient, but not greater than necessary" to address 18 U.S.C. §3553

- 1 -

and the specific mitigating factors further described below.  Mr. Miller submits this sentencing memorandum in support of his request.

Attached to the sentencing memorandum is: (1) a letter from his Jennifer Miller (Exhibit A); (2) letter from Aaron Pava (Exhibit B); (3) letter from Richard W. Goldstein (Exhibit C); (4) letter from James Citron (Exhibit D); (5) letter from Stacy Simons (Exhibit E); (6) letter from Courtney Coleman (Exhibit F); and (7) declaration of Joyce Leavitt (Exhibit G).

## BACKGROUND

### A.   Offense Conduct

On February 17, 2007, defendant Jay Miller burglarized the estate of the late William Ernest Hocking in Madison, New Hampshire.  Plea Agreement at ¶2.  Mr. Miller stole hundreds of used, rare or antique books from the library of the estate, as well as other items, which he then mailed to California.  Plea Agreement at ¶2.  Mr. Miller is a book collector and former book store owner who was previously married to the great grand-niece of William Hocking.  PSR ¶8, 9.  At the time of the offense, Mr. Miller was under the influence of prescription medications as well as illegal narcotics which impaired his judgment.  Exhibit G.

Within three weeks after he took the books and shipped them to California, Mr. Miller realized the foolishness of his actions and attempted to mitigate them by shipping the books back to the investigating officers in Madison, New Hampshire.[1]  Plea Agreement at ¶2.  Mr. Miller mailed the books to the Madison Police Department on March 10, 2007 and they were received on March 22, 2007.  PSR ¶12.  The parties agree that the value of the stolen books and other items exceeded $200,000.  The actual loss, however, once the books were returned, recovered or otherwise found by the family, is just $10,295 plus the cost of re-cataloging the books[2] *Id*. at ¶8.

Mr. Miller has read the letters by the Hocking family and recognizes the pain he caused them.

---

[1]Mr. Miller says that he intended to ship all of the books back but that the place closed before he got the last box to them.  Whatever the reason, all but one box of books and items were returned.

[2]The parties agree to allot up to $10,000 for re-cataloging the books.  Plea Agreement at ¶8.

As the facts of the offense make clear, it was not a well conceived offense.  Mr. Miller was immediately sorry for his actions.  He apologizes to the family.

### B. Personal History and Prescription Drug Use

#### (i) personal background

Jay Miller is a 36 year old Caucasian male who was raised in a seriously dysfunctional family as described by his sister, Jennifer:

> Jay had no positive role model in a father, a really bad man. . .no baseball toss. . . no parental support . . . they were not around to parent. . .our mother had her own demons.  She was only 16 years old when she had Jay and came from a very abusive childhood.  My memories of her include her screaming, hitting, beating and berating us.

Exhibit A.  When he was twelve or thirteen years old, Mr. Miller's mother had an affair and moved to Australia.  The father responded by moving the family without notifying the mother, while telling the children that their mother was "worthless, a bitch, a whore."  PSR ¶54.  When he was 17 years old, Jay ultimately escaped to go to college.  *Id.* at ¶55.

Although the Hocking family describes Mr. Miller in very negative terms, letters from family and friends paint a different picture of an undoubtedly complicated individual.  For example,  Mr. Miller's sister, Jennifer, describes her brother as exceptionally smart, with potential now that he is off drugs. Exhibit A.  Others describe Mr. Miller as reliable, generous and kind.  *See, e.g.* Exhibit B (always . . . someone I could count on 100%"); Exhibit C ("It took a really deep human being to see the suffering that Jay saw in me, and to intuitively know what I needed"); Exhibit D ("everything I have seen him do has been in the spirit of generosity"); Exhibit E (I . . .have always known [Jay]. . to be a kindhearted . . . a generous person."); Exhibit F ("Jay has always been a very kind and generous friend . . . warm, enthusiastic, upbeat and a devoted father.")

#### (ii) mental health history and prescription drugs

Mr. Miller's mental health history includes long-standing depression, for which he has taken anti-depressant medication since at least 2005.  Exhibit G; PSR ¶62.  The diagnosis has been re-affirmed by a doctor at the federal facility and Mr. Miller is still being prescribed anti-depressants

1  while in custody.

2  From at least December, 2004 through February, 2007, Mr Miller met with a physician in Berkeley, California, Dr. Jonathan Noble.  Exhibit G.  Dr. Noble's notes reflect that Mr. Miller suffers from depression and Dr. Noble prescribed wellbuterin and paxil.  Exhibit G.  Dr. Noble's notes also reflect that Mr. Miller suffered from anxiety for which he was prescribed ativan.  *Id*.  The notes reflect that he was prescribed adderal for attention deficit disorder,[3] as well as oxycotin and dilatid for generalized pain related to recurring kidney stones.  *Id*.  These medication were prescribed over a two year period.  *Id*.  The medications are a combination of opiate, stimulants and a tranquilizer which would cause serious impairment.  *Id*.  Moreover, even if Mr. Miller were taking only the anti-depressant medications, the medications are stimulants which cause mania and contribute to irrational judgment and poor decision-making.  Exhibit G at ¶4.

In addition to the prescription medication, Mr. Miller became addicted to a number of street drugs including methamphetamine and heroin.  *Id*. at ¶64.  He was under the influence of these drugs at the time of the offense.  The offense conduct alone makes it clear that Mr. Miller was not in his right mind at the time he committed the offense. At the time of his arrest months later, however, Mr. Miller was attending Narcotics Anonymous meetings and trying to get a handle on his addiction.  Should Mr. Miller get drug treatment, which he is asking for, the Court will not see him again.

**C. Extraordinarily Harsh Conditions of Confinement**

Mr. Miller is currently housed at FDC-Dublin in Dublin, California.  On January 8, 2008, three inmates demanded that Mr. Miller give them his radio and commissary items.  Exhibit G.  He refused.  The next day, on January 9, 2008, he was assaulted by these individuals in a laundry room where he works as an attendant.  *Id*.  The inmates shut the door, and then proceeded to beat Mr. Miller with locks and fists and kicked him with steel-toed work boots.  *Id*.  As Mr. Miller later tried to get by one of the inmates in the hall to seek help and the inmate refused, a unit officer spotted them

---

[3] The PSR states that Mr. Miller "self-diagnosed" himself with attention deficit disorder but the notes from Dr. Noble include this diagnosis.

engaged. Mr. Miller subsequently lost consciousness and also suffered a seizure. He was taken to the hospital and kept overnight. *Id*. At the hospital, the staff ordered two CAT scans of Mr. Miller's head. *Id*.

As a result of the assault, Mr. Miller suffered a concussion, lacerations (requiring stitches), hematomas, a deviated septum (making it difficult for him to breath) and loose teeth. *Id*.

On January 10, 2008, Mr. Miller was brought back from the hospital and placed in the SSU also known as "the hole." *Id*. Mr. Miller was told that he was being placed in the hole primarily for his protection since there is no protective custody at the facility. However, it was also indicated to him that he was being placed in the hole because of the fight and that no distinction was being made between the aggressors and the victim.

As a result of his being assaulted, Mr. Miller has been in "the hole" since January 10, 2008 (aside from two days). *Id*. The unit is made for offenders under investigation or being punished. This means that Mr. Miller is required to be on "lock down" 23 hours per day. His phone calls and commissary are restricted. He is in a single person cell and has no contact with any other inmates. Every time he has "movement," such as going to the shower, or for recreation or using the phone, he is required to be in full restraints. His recreation is limited to one hour a day, five times a week. His recreation consists of being placed in a cage which is 8' by 12.' In addition, according to Mr. Miller, he has lost 27 days of good time because of his involvement in the fight. *Id*.

## DISCUSSION

**A.    The Criminal History Category should be II not III**

The USPO incorrectly states that Mr. Miller's criminal history category is III because he was on probation at the time of the instant offense.[4] PSR ¶49. The USPO points to a case in which Mr. Miller was placed on probation on June 29, 2007, just a couple of days before his arrest in the instant case. *Id*. Yet, the instant offense involves Mr. Jay transporting stolen goods in interstate commerce

---

[4]Defense counsel provided these comments to the USPO on February 12, 2008, however, the USPO neither acknowledges receipt of the comments in the addendum, nor does the USPO incorporate any of the comments into the final PSR.

between the dates of February 17, 2007, when the books were first stolen, and March 22, 2007, when the books arrived at the police station in New Hampshire. Plea Agreement at ¶2. During the time of the offense, Mr. Miller was not on probation. On June 29, 2007, when Mr. Miller was sentenced to probation in an unrelated case, the offense conduct in the instant offense had been completed. Thus, at the time of the offense, Mr. Miller was not under a criminal justice sentence such as probation, his criminal history points are two, and his criminal history category is II and the guideline range should be recalculated.[5]

**B.  A Split Sentence Which Includes 8 months in Custody and 2 months in a half-way house is Sufficient, But Not Greater Than Necessary, to Satisfy the Goals of Sentencing**

After *United States v. Booker*, 543 U.S. 220, 260-61, 125 S. Ct. 738 (2005), the guidelines are no longer binding on the Court. *Booker* clarifies that the Guidelines are simply one of a number of factors a court must consider in imposing sentence. 125 S. Ct. at 764. In addition, courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) in imposing sentence. *Id.* Furthermore, the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *Gall v. United States*, No. 06-7949, 552 U.S. __, 128 S. Ct. 586, 602 (2007)(finding a sentence outside the Guidelines to be reasonable); *Kimbrough v. United States*, No. 06-6330, 552 U.S. __, 128 S. Ct. 558, 570 (2007)(noting that courts may vary from the Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines). The primary directive in §3553(a) is that the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing. *See* 18 U.S.C. §3553(a).

In this case, a split sentence is sufficient to meet the purposes of sentencing. Some of the factors which the Court should consider are discussed below.

**1.  Nature and Circumstances of the Offense**

Under 18 U.S.C. §3553(a), the Court should consider the nature and circumstances of the

---

[5] In its sentencing memorandum the government recommends a sentence of 18 months although it appears that the government may mistakenly have calculated the guideline range at offense level 15, criminal history II to be 18 - 24 months and argues that 18 months is appropriate.

- 6 -

offense in determining an appropriate sentence. In this case, the transportation of stolen goods was an ill-conceived crime committed by an individual under the influence of prescription medication and other drugs. The family is understandably very upset about the burglary.

However, the offense is mitigated by a number of factors. First, Mr. Miller fairly quickly realized the foolishness of his actions and attempted to mitigate the offense by shipping the books back within three weeks of having taken them. Plea Agreement at ¶2. Thus, the burglary was solved and vast majority of items returned within a matter of weeks. Although the books were valued at more than $200,000, the actual loss, as reflected in the amount of restitution owing, is just $10,295 plus the cost of re-cataloging the books should the family decide to incur the expense. *Id*. at ¶8. The offense is a burglary. The victims involve one family. Given all of the circumstances, a sentence of 8 months in custody, followed by 2 months in a half-way house or home detention is sufficient.

**2.    The History and Characteristics of Jay Miller**

**(i) aberrant behavior**

Where an individual commits an offense without significant planning, of limited duration and which marks a deviation from an otherwise law abiding life, a sentence below the guideline range may be warranted. *See, e.g. United States v. Gonzales*, 281 F.3d 38 (2nd Cir. 2002); *United States v. Smith*, 387 F.3d 826 (9th Cir. 2004). In the present case, Mr. Miller has a total of two criminal history points. He has no prior theft offenses. It is clear that the offense was a single incident based upon an ill-conceived plan which was of limited duration. The conduct constitutes aberrant behavior.

**(ii) Diminished Capacity**

Even before the *Booker* case was decided, the guidelines recognized that a below sentence guideline may be warranted where someone commits an offense while suffering from significantly reduced mental capacity which contributed to the commission of the crime. *See, e.g.* USSG §5K2.13 Historically, however, a below guideline sentence would not be acceptable if the reduced mental capacity were caused by the voluntary use of drugs. *Id.*; *see also United States v. Cantu*, 12 F.3rd 1506, 1512, 1516 (9th Cir. 1993)(The goal . . .is lenity towards defendants whose ability to make

1  reason decisions is impaired); *United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993)(even though
2  drug use and even though mental disease not severe, drug use was both "a product and factor of his
3  impaired condition."). However, where an individual is prescribed medication, the use of that
4  medication is not "voluntary."
5  At the time of the offense, Mr. Miller was under the influence of prescription medications
6  which undisputedly impaired his ability to use good judgment. While it is true that Mr. Miller was
7  also taking illegal narcotics, the prescribed medications alone would have seriously impaired his
8  ability to use rational judgment. Exhibit G. Even properly prescribed amounts of the anti-
9  depressants would cause mania which would contribute to irrational judgment and decision-making.
10 *Id.*
11 Mr. Miller does not intend to make excuses for his actions and he accepts full responsibility
12 for the crime which he has committed. However, in considering the appropriate sentence in this case
13 the fact that Mr. Miller was on prescription medication which impaired his thinking is relevant under
14 18 U.S.C. §3553.

**(iii) Lack of youthful guidance and abuse as a child**

16 The Ninth Circuit has recognized that the suffering of extraordinary abuse or even lack of
17 youthful guidance as a child are considerations in determining an appropriate sentence. *See, e.g.,*
18 *Landrigan v. Schriro*, 441 F.3d 638, 648 (9th Cir. 2006)("Where a defendant's crime is attributable to
19 a disadvantaged background or emotional or mental problems the defendant is less culpable than one
20 without the excuse");*United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991)(defendant's abandonment
21 by his parents and lack of guidance of a youth rends defendant less culpable.);*United States v. Roe*,
22 976 F.2d 1216 (9th Cir. 1992)(court errs in determining no discretion to depart based upon
23 extraordinary abuse as a child).
24 In the present case, Mr. Miller's sister alludes to a childhood filled with abuse and neglect.
25 *See* Exhibit A ("no positive role model in a father, a really bad man. . . no parental support . . . they
26 were not around to parent . . .my memories of . . . [the mother] include her screaming, hitting, beating

1  and berating us.") The information is limited.  However, the Court should consider it in order to
2  determine an appropriate sentence.

3                 **(iv)  Extraordinary Harsh Conditions of Confinement**

4         Where a defendant is subjected to solitary confinement or other harsh circumstances related
5  to his incarceration, this Court should consider whether a lesser sentence is warranted under 18
6  U.S.C. §3553.  *See, e.g. United States v. Noriega*, 40 F. Supp. 2d 1378 (S.D. Fla 1999)("There is little
7  question that [segregated confinement] is more difficult type of confinement than in general
8  population"); *McClary v. Kelly*, 4 F. Supp. 2d 195, 207 (W.D.N.Y. 1998)(conclusion that prolonged
9  isolation increases the risk of developing mental illness does not strike this court as rocket science).

10        In addition, a defendant who suffers from extraordinary punishment not contemplated by the
11 guidelines or who otherwise is punished through collateral consequences should receive a below
12 guideline sentence.  *See, e.g. United States v. Clough*, 360 F.3d 967 (9th Cir. 2004)(discretion to
13 sentence below the guidelines where defendant was shot by police during arrest because "significant
14 injuries" constitute a continuing form of punishment which is not considered by guidelines); *United*
15 *States v. Stone*, 374 F. Supp. 2d 983 (D.N.M. 2005)(court concludes that client "suffered a lot" as
16 result of crime such that 18 month deviation from the guidelines was proper.)

17        In the present case, Mr. Miller suffered collateral consequences in that he was assaulted by
18 three individuals, lost consciousness, suffered a seizure and was taken to the hospital and kept
19 overnight.  *Id*.   The collateral consequences include a concussion, lacerations (requiring stitches),
20 hematomas, a deviated septum (making it difficult for him to breath) and loose teeth.  *Id*.

21        More significantly, Mr Miller has been subjected to solitary confinement and other harsh
22 conditions of incarceration.  He is on "lock down" 23 hours per day, his phone calls and commissary
23 are restricted, he has no contact with any other inmates and every time he has "movement," such as
24 going to the shower, or for recreation or using the phone, he is required to be in full restraints.  *Id*.
25 Furthermore, because he was attacked and is now being housed in the hold, Mr. Miller's recreation is
26 limited to one hour a day, five times a week and consists of being placed in a cage which is 8' by 12.'

*Id*.  In addition, he has lost 27 days of good time because of his involvement in the fight. *Id*. Under these circumstances, a sentence of 8 months in custody and 2 months home detention or half-way house is appropriate.

### 3. A split sentence is sufficient to show respect for the law, just punishment and adequate deterrence especially where Mr. Miller has suffered extraordinarily harsh conditions and collateral consequences from being in custody

18 U.S.C. §3553 provides that the Court shall consider the need for a sentence to promote respect for the law, provide just punishment for the offense and afford adequate deterrence to criminal conduct.  A split sentence of 8 months in custody and 2 months in a half-way house is sufficient to show respect for the law given the nature of the offense.  Furthermore, a split sentence is sufficient for just punishment and adequate deterrence when the collateral consequences of Mr. Miller's confinement are factored into the punishment.  His harsh incarceration has been a serious wake-up call and Mr. Miller has been adequately deterred.  He will not be committing crimes in the future.

Finally, a split sentence would further "needed educational, vocational or other correctional treatment" because Mr. Miller can get training while on supervision.

### 4. Most Effective Way to Pay Restitution to Victims

In this case, Mr. Miller will better be able to pay restitution if he is allowed to resume working.  Mr. Miller would like to pay off the restitution as soon as possible. Restitution is a factor to consider under 18 U.S.C. §3553(a)(7).  This factor weighs in favor of the sentence requested.

### CONCLUSION

For all of the reasons described above, Jay Miller respectfully urges the Court to sentence him to a split sentence of 8 months in custody and 2 months in home detention or a half-way house.

Dated: March 4, 2008

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender
/S/

JOYCE LEAVITT
Assistant Federal Public Defender

- 10 -